UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS ZICH, | ) | CASE NO. 3:18CV02515 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| WARDEN JAMES HAVILAND, | ) | |
| Allen-Oakwood Correctional | ) | REPORT AND RECOMMENDATION |
| Institution, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Respondent. | ) | |
| | ) | |

On October 31, 2018, Petitioner Thomas Zich ("Petitioner"), through counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF Dkt. #s 1, 1-2. In his habeas corpus petition, Petitioner asserted five grounds of relief. ECF Dkt. #s 1, 1-2. For the following reasons, the undersigned RECOMMENDS that the Court DISMISS Petitioner's federal habeas corpus petition (ECF Dkt. #s 1, 1-2) in its entirety WITH PREJUDICE.

I.    FACTUAL HISTORY

The Ohio Sixth District Court of Appeals set forth the facts of this case on direct appeal. ECF Dkt. #7-1[1] at 312-55. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6thCir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999). As set forth by the Sixth District Court of Appeals, the facts are:

---

[1] Citations to the State Court Record, ECF Dkt. #7-1, will refer to the .PDF page numbers rather than to specific exhibits or PAGEID numbers.

1

{¶2} On June 1, 2007, appellant was indicted on a charge of murder arising out of the death of his wife, Mary Jane Zich, whose body was found in Lucas County on December 18, 1991.

{¶3} Before his trial, appellant filed a number of motions, including a motion to dismiss based upon preindictment delay, as well as a motion in limine to exclude testimony by three of appellant's former wives. The trial court denied the motion to dismiss and the motion in limine.

{¶4} On the first day of trial, during jury selection, one of the prospective jurors stated that she and her husband worked with appellant and that she had heard gossip about him, but that she could be impartial. The next day, the same prospective juror said she was uncomfortable in court because she was a domestic violence victim. She further stated that her acquaintance with appellant made her very uncomfortable.

{¶5} Questioning of the prospective juror continued outside the presence of the other jurors, at which time the prospective juror said that her negative feelings about appellant would, in fact, prevent her from being totally objective. The trial court excused her for cause. Appellant's counsel then moved to voir dire the remaining jurors individually or, in the alternative, to declare a mistrial. The court, after considering the answers that the excused prospective juror gave in the presence of the other prospective jurors, concluded that individual voir dire would create "greater potential for harm by highlighting what [the excused prospective juror] said." On that basis, the trial court denied both motions.

{¶6} During the evidentiary portion of the trial, evidence of the following was adduced. Then 26-year-old Mary Jane met then 44-year-old appellant sometime in 1990, while she was working as a waitress. At the time, Mary Jane had a young child, Desiree, from a previous relationship. Mary Jane and appellant married in early 1991.

{¶7} Shortly after the marriage began, Mary Jane and appellant started participating in a personal wealth group and purchasing various parcels of real property. During their participation in the personal wealth group, Mary Jane and appellant met witness Michele Mauder and her husband.

{¶8} In addition to their acquaintance through the workshops, Mauder and Mary Jane recognized one another as childhood friends, and Mauder recognized appellant from work. Mary Jane and Mauder quickly renewed their friendship. Mauder talked to Mary Jane on a daily basis and visited with her four or five times a week.

{¶9} Beginning in March 1991, appellant started visiting Mauder in the morning, after Mauder's husband left for work. During these visits, appellant complained to Mauder that Mary Jane was using drugs, spent too much money, and was seeing someone else. Eventually, Mauder told Mary Jane about the visits, and appellant stopped dropping by as frequently. Mary Jane, on the other hand, began to discuss her marital problems openly with Mauder.

2

{¶10} On a summer evening in 1991, Mary Jane and Mauder went to a "Party in the Park" in Toledo, together with some other female friends. Despite there being no bright sun, Mary Jane was wearing large-frame sunglasses. Mauder pulled the sunglasses off of Mary Jane's face and saw that underneath the sunglasses Mary Jane had a "big black eye." That evening, Mauder observed appellant following Mary Jane and her group of friends as they moved around downtown. Mary Jane told Mauder on this night that she intended to leave appellant.

{¶11} At some point, Mary Jane also discussed with Mauder the possibility of traveling to Wisconsin to talk to several of appellant's ex-wives. Appellant, in a subsequent conversation between himself and Mauder, suggested to Mauder that she tell Mary Jane not to make the trip to Wisconsin. Mauder remarked to appellant that he would not know about Mary Jane's plans to go to Wisconsin unless he had taped their conversation. Appellant responded by stating, "You could say that."

{¶12} In the fall of 1991, Mary Jane renewed another former relationship, this time with Kenny Montano. Kenny Montano testified that he and Mary Jane dated from 1981 or 1982 until he was imprisoned in 1984. After his release in 1986, they remained friends. In 1987, Montano was again sent to prison, where he stayed until October 1991. During this period of incarceration, he and Mary Jane wrote to one another and communicated by telephone on a regular basis. Upon his release, on October 10, 1991, Montano began visiting with Mary Jane in person. The friendship soon developed into a romantic relationship. Sometime in October 1991, Mary Jane told Montano that she did not want to be married anymore.

{¶13} At about the same time that Montano and Mary Jane renewed their relationship, appellant began to see Luanna Urbanski. Urbanski testified that she met appellant in August 1991 while she was working as a waitress at a Bob Evans restaurant. At first, the two knew each other only as customer and waitress. Thereafter, Urbanski gave appellant her phone number. During their conversations, appellant told her that his wife was cheating on him and that he was feeling used.

{¶14} Urbanski's relationship with appellant began to change on November 17, 1991, when appellant told her that his relationship with his wife was over and that he planned to divorce her. On that date, appellant and Urbanski went out and had a few drinks. Afterward, appellant took her to look at his rental properties and told her that by Thanksgiving Mary Jane would be moving out of the couple's home and moving into one of the rental properties. Appellant complained that Mary Jane was going to "take everything" from him. Urbanski tried to assure him that that had not been her experience, but appellant said that he had "already been taken to the cleaners * * * and he wasn't going to let that happen again."

{¶15} On Sunday, November 23, 1991, Mary Jane's family, including Mary Jane, celebrated the Thanksgiving holiday. At that time, the family was busy planning another event, a going-away party scheduled to be held on December 6. Mary Jane volunteered to hire a band for the party.

3

{¶16} Sometime between November 23 and 27, appellant visited Rene Andaverde, one of Mary Jane's brothers. Appellant asked Rene for Kenny's last name, and told Rene that the reason he was asking was that he thought Kenny was seeing Mary Jane. Rene told appellant that he knew nothing about a relationship between Kenny and Mary Jane, and he declined to give appellant Kenny's last name.

{¶17} Two or three days before Thanksgiving Day, Mary Jane spent the night with Montano, at his house, in Toledo. They returned to her house, in Genoa, the next morning so that she could shower and change. Montano said that she showed him through the house, which was clean, and that he saw the bathroom, which was undamaged. Montano testified that he was uncomfortable in the house, so he asked Mary Jane to pack up clothes so that she could shower and change later. Mary Jane complied with Montano's request.

{¶18} As they were driving away from the house, Montano stated that Mary Jane saw appellant driving toward them, and instructed Montano to get down in the passenger seat. He further stated that Mary Jane pulled over into a driveway, and that appellant made a U-turn back toward them, pulled off to the side a little and looked at them before he continued driving. Montano and Mary Jane continued on their way to Montano's father's house in Toledo.

{¶19} Montano stated that he and Mary Jane stayed at his father's house until Thanksgiving night. On Thanksgiving night, Montano and Mary Jane dropped Desiree off at a babysitter's house, and then spent the night in a motel. The next day, they checked out of the motel and returned to Montano's father's house.

{¶20} Montano testified that Mary Jane had planned to give his stepmother a ride to work on her way back home. He also testified that when he saw her last, Mary Jane was wearing pink sweatpants, a sweatshirt and sneakers.

{¶21} According to Montano, he and Mary Jane arranged to meet at a dance on Saturday night, and on Saturday afternoon he repeatedly tried, without success, to call her to verify their plans. Mary Jane did not appear at the dance.

{¶22} Rachel Montano, Kenny's sister and Mary Jane's friend, testified that she made several calls to the Zich's house after the dance on Saturday, and that appellant said that Mary Jane was not home. When Rachel and Montano were unable to reach Mary Jane, first on Sunday and then again on Monday, they went to the Zich's home. Mary Jane's car was not there, and no one answered the door. They also stopped at the house Montano thought Mary Jane would live in after the divorce, but no one was home, and Mary Jane's car was not there.

{¶23} Witness Sandy Schwartz, who was a friend of Mary Jane, testified that "right around Thanksgiving," Mary Jane and Montano dropped Desiree off at her house in the middle of the evening. When Mary Jane picked up Desiree the next day, she told Schwartz that she planned to go home and ask for a divorce. Schwartz never saw Mary Jane again.

4

{¶24} Witness Cheryl Zimmerman, a tenant in appellant's east Toledo, White Street property, testified that in November 1991, while she was preparing food for Thanksgiving dinner, appellant brought Desiree to her house. She stated that she was not certain of the date, and that it could have been either before or after Thanksgiving Day, because the celebration was planned around her mother's work schedule.

{¶25} According to Zimmerman, appellant insisted that she babysit on this occasion, because he had something "very important" to take care of and that he had no other choice but to have Zimmerman watch the child. Zimmerman testified that she did not know appellant well, and did not know Desiree at all. In fact, she testified, she did not know until that time that appellant even had a daughter.

{¶26} Zimmerman stated that appellant was gone for about four hours, and when he returned, he picked up Desiree in a hurry and left. Zimmerman never babysat the child again.

{¶27} Witness Roger Monroe testified that sometime in November 1991, he was at the Free-Way restaurant, in Oregon, Ohio, when appellant—whom Monroe knew as a fellow customer at the restaurant—asked him for a ride home. Appellant told Monroe that he had locked his keys in his truck and then walked to the restaurant to find someone to give him a ride. (According to appellant, in his 2007 tape-recorded statement to police, on the day he received the ride from Monroe, he started out at one of his various rental properties, walked to his rental property on White—where Zimmerman lived—and then got a ride to the Free-Way restaurant.)

{¶28} When Monroe pulled into appellant's driveway, appellant gave him money for gas and thanked him. Monroe observed appellant walk to the front door of his house and then retrieve "a whole handful of keys" from his pocket, before entering his house. Monroe offered to take appellant back to his truck so he could drive it home, but appellant declined the offer, telling Monroe he would have his wife get it in the morning.

{¶29} On Sunday, December 1, appellant took Desiree to Bob Evans. Urbanski was working that day, and when she saw appellant, she approached him and noticed that he was smiling. He told Urbanski that he and Mary Jane had separated, and that Mary Jane had dropped Desiree off on Friday, November 29, and would pick her up on Monday, December 2. That night, Urbanski went to dinner with appellant and Desiree, but afterward told appellant that she did not want to get any more involved with him until after the divorce was final.

{¶30} On December 6, appellant appeared at the Andaverde family going-away party with Desiree. Although the band that Mary Jane volunteered to hire was present at the event, Mary Jane herself was not. During the party, appellant told Jose Andaverde, another of Mary Jane's brothers, that Mary Jane had gone to Florida. Jose encouraged appellant to file a missing person report.

5

{¶31} According to Ludvina Andaverde, Mary Jane's sister, sometime after December 6, but before December 18, when Mary Jane's body was found, appellant told Ludvina that Mary Jane was in Florida for rehab.

{¶32} On December 7, appellant called the Ottawa County Sheriff's office to report that Mary Jane had been missing since November 29, 1991. Appellant told police that on the day she disappeared, Mary Jane received a phone call at about 7:30 p.m., and left shortly afterwards, leaving Desiree with him. He stated that he and Mary Jane were going to separate, and that it was unusual for Mary Jane to have left Desiree with him. He further reported that Mary Jane had previously had drug and alcohol problems, that he was not receiving as many phone calls from Mary Jane's friends as he usually did, and that he had received Mary Jane's driver's license in the mail.

{¶33} On December 13, appellant called Urbanski. This time, he told her that when Mary Jane left the child on November 29, she was supposed to have been back in an hour—rather than in a few days, as he had initially told Urbanski—and that she never came back. Two days later, Urbanski had dinner with Desiree and appellant. Appellant asked her to come to his house, and when Urbanski said, "what if your wife came home," appellant replied, "trust me, she's not coming home."

{¶34} Sometime in December 1991, prior to December 18, witness Tammie Harper noticed a strange car parked in front of her apartment building, on Greenwood. She stated that she knew the car did not belong there, because it had Ottawa County license plates. She further stated that the car had been parked in that spot for about three weeks before she finally decided to break into it and steal the purse that was located on the front seat. She testified that when she opened the purse, she found that it contained about $20 in cash, some gold earrings and a driver's license. Harper kept the money, put the license in a postal box, and gave the earrings away.

{¶35} On December 18, 1991, Mary Jane Zich's body was discovered in the locked trunk of her car, on Greenwood, near the Oak Street Tavern in east Toledo. December 18 was a cold, wintery day, with snow on the ground. The car's right wing window was broken out, and the glove box contained a registration for appellant.

{¶36} Mary Jane's body was clothed in a white sweatshirt, pink pants, and white shoes. Inside the trunk, along with Mary Jane's body, was a length of 3/8 inch thick rope.

{¶37} When appellant was interviewed by police that night, he said that Mary Jane had spent Thanksgiving with her friend, Rachel, and had come home at about 6:00 p.m., the following day. He repeated his story that Mary Jane had gotten a phone call and then left around 7:30 p.m., after which he did not see her again. He also repeated that his marriage was not going well, and that he and Mary Jane had planned to separate. Finally, appellant reported that the last time he saw Mary Jane,

she was wearing pink pants, fit tight around the ankles, and a white sweatshirt with pink on the front.

{¶38} Witness Craig Emahiser, who in 1991 was the Clay Township Police chief, testified that after Mary Jane's body was discovered, her family sought to obtain custody of Desiree. Emahiser identified a birth certificate that was produced by appellant in response to the family's request for custody. The birth certificate indicated that appellant was Desiree's father and that Desiree's last name was Zich. Desiree, however, was not appellant's child. She was born in 1988, before appellant met Mary Jane, and her last name was Andaverde, not Zich.

{¶39} Forensic pathologist and deputy coroner, Dr. Cynthia Beisser, described several linear abrasions on Mary Jane's neck that were consistent with ligature strangulation. Beisser opined to a reasonable degree of medical certainty that the cause of death was ligature strangulation, and that the manner of death was homicide. She could not determine a time of death, because decomposition of the body stopped when the body was frozen.

{¶40} Beisser testified that she could not exclude exhibit No. 12, a length of 3/8 inch thick rope that was shown to her by the prosecution, as having made the abrasions on Mary Jane's neck.

{¶41} Throughout the investigation—both in 1991 and again in 2007, when the case was reopened—appellant maintained that Mary Jane had a drug and alcohol problem, and that he had previously been involved with her treatment for such. Among the drugs he accused Mary Jane of using were cocaine and marijuana.

{¶42} Witnesses Mauder and Montano, on the other hand, both testified that they never saw Mary Jane use drugs, and Jose Andaverde denied knowing that Mary Jane had a drug problem.

{¶43} The 1991 autopsy—which involved samples that were tested for marijuana, cocaine, alcohol, benzodiazepines, barbiturates and opiates—revealed no signs of drug or alcohol use.

{¶44} Numerous witnesses who knew Mary Jane, including appellant, described her as a well-dressed and well-groomed woman.

{¶45} There was similar agreement among the witnesses—including appellant, until his 2007 interview—that Mary Jane did not usually leave Desiree with appellant. There was testimony that Mauder babysat Desiree about twice a week during 1991, and that Mary Jane's mother and her friend Sandy Schwartz frequently babysat the child.

{¶46} According to testimony by supervisor of the Toledo Police Department's cold case unit, Toledo Police Sergeant Steven Forrester, investigation of the current case was reopened in 2004, after contact was made by one of Mary Jane's family members. The cold case unit evaluated reports from Toledo, Lucas County, Ottawa

County, Clay Township, and several jurisdictions in other states. Investigation revealed, at this time, that between May 28, 1991 and November 4, 1991, appellant and Mary Jane had purchased properties at 311 Whittmore, 808 Earl Street, 733 Noble, 642 White Street, and 634 Williams. The deeds were joint, with rights of survivorship.

{¶47} Forrester tape recorded the 2007 police interview with appellant, during which appellant indicated the following: (1) he denied knowing that Mary Jane had a boyfriend before she died, and he denied ever seeing her with another man; (2) he denied that it was unusual for Mary Jane to leave Desiree with him; and (3) he denied that he and Mary Jane were fighting or that the subject of divorce was an issue on the night she left. He did allow that it was not until Mary Jane disappeared that he ever had to find babysitters for the child. When asked why he did not take Desiree to her grandmother's house, he said, "I can't really – I can't really say for sure. I don't really remember." And when asked about a report that the shower curtain in the Zich's bathroom was torn and the shower curtain rod was torn out of the plaster, appellant claimed that that damage had occurred while appellant and Mary Jane were having sex, "way before" Mary Jane disappeared.

{¶48} When the case was reopened, physical evidence was submitted for DNA analysis. Forensic scientist, Stacy Violi confirmed that DNA testing was performed on swabs from Mary Jane's vagina, the rope found with her body, and samples from her sweatshirt. Sperm from the vaginal swab was consistent with Montano's DNA, and cuttings from the sweatshirt were consistent with Mary Jane's DNA. No DNA was detected on the rope.

{¶49} Several of appellant's former wives were also permitted to testify at trial. The first of the wives, Hope Ott, testified that she met appellant in 1967 or 1968, when she was 20 years old. They married in September 1968. According to Ott, within three months, the marriage began to deteriorate, and within a short time Ott told appellant that she wanted a divorce. One night, following her declaration that she wanted a divorce, appellant came home, lunged at her, awaking her from her sleep, and started choking her with his hands. Ott played dead and went limp. Appellant picked up her hand, and Ott let it fall back. He put his head on her chest, as if listening for a heartbeat, and then he went to sleep.

{¶50} Another wife, Sharyn Bonderud, testified that she met appellant in 1972, after which they dated for two or three months and then married. She stated that in the spring of 1977, she and appellant were at home when she received a phone call from a woman, and afterward left the house. Bonderud followed appellant to a bar, where she saw him kissing another woman. Bonderud confronted appellant, who told her to follow him home. Bonderud stated that appellant led her to a dark, dirt road, and then stopped his truck. He exited his car and, wearing gloves, went over to the passenger side of Bonderud's car and got in the seat beside her. According to Bonderud, appellant began stroking her hair and telling her, "I really did love you," and then started strangling her with his hands. When Bonderud struggled in

8

response, appellant "went blank," got out of the car, and told Bonderud to follow him home.

{¶51} Bonderud did as she was told, and began following appellant once again. She stated that he led her onto a paved road, after which he stopped his truck, for a second time. This time, he exited the truck carrying a rifle. He asked Bonderud if she saw a deer in the field. When Bonderud answered that she did not, appellant told her to look straight ahead. He then walked, with his rifle, behind Bonderud's car. Bonderud immediately drove away and picked up her children from appellant's mother's house. She subsequently filed for divorce.

{¶52} A third wife, Beverley Chancey, testified that she met appellant in 1988, when he was a customer at the Bob Evans restaurant where she was a waitress. The two dated for three months and then got married in April of that year. By sometime in October or November 1988, appellant said he wanted a divorce. Chancey taped one of their conversations about why he wanted a divorce, and when she revealed to appellant what she had done, he "went after" her, pushing her against the wall and holding his hand against her neck, until she finally gave him the tape.

{¶53} The trial court instructed the jurors that the evidence from Ott, Bonderud and Chancey could not be considered to prove character, but could only be considered in relation to issues of motive, opportunity, intent or identity.

{¶54} At the close of the state's case, defense counsel moved for acquittal, based on both the evidence and the theory that venue was improper in Lucas County. The trial court denied the motion.

{¶55} The jury found appellant guilty of murder and the trial court sentenced him to fifteen years to life in prison. ***

ECF Dkt. #7-1 at 313-27.

The undersigned recommends that the Court find that Petitioner has not rebutted the presumption of correctness by clear and convincing evidence. Petitioner supplemented, rather than rebutted, the court of appeals' factual findings. *See* ECF Dkt. #10 at 2-5. The undersigned will address Petitioner's relevant factual contentions in the Analysis section *infra* as they coincide with his instant habeas grounds of relief.

## II.     PROCEDURAL HISTORY

### A.     State Trial Court

9

On June 1, 2007, a Lucas County Grand Jury indicted Petitioner with one count of murder in violation of R.C. §§ 2903.02(A) & 2929.02. ECF Dkt. #7-1 at 7-8. The offenses were prosecuted in Lucas County Common Pleas Court Case No. CR-0200702164, *State v. Thomas Zich*. Petitioner, through counsel, pleaded not guilty, and the case was set for trial. *Id.* at 9.

Prior to trial, Petitioner filed a motion to compel discovery, to which the State did not respond. ECF Dkt. #7-1 at 10-11. The trial court held a hearing, and, on April 11, 2008, it ordered the State to provide defense counsel with all witness names and addresses and a list of physical evidence within two weeks, but it denied Petitioner's motion to compel copies of witness statements as moot. *Id.* at 12.

On July 11, 2008, Petitioner filed a motion to dismiss the indictment on speedy trial grounds. ECF Dkt. #7-1 at 13-20. The State opposed the motion to dismiss, and Petitioner filed a reply. *Id.* at 21-27; 28-31. On September 4, 2008, the trial court held a hearing, granting defense counsel an extension of time to file a supplemental brief. *Id.* at 32. Thereafter, Petitioner filed a supplement to his motion to dismiss, the State filed an oppositional response, and Petitioner filed a reply. *Id.* at 33-40; 41-45; 46-49. Petitioner filed a second and a third supplement to his motion to dismiss. *Id.* at 50-56; 57-62. The State filed a memorandum in opposition to Petitioner's second and third supplements to his motion to dismiss. *Id.* at 63-77. Petitioner filed another reply. *Id.* at 78-85.

Petitioner and the State filed a stipulation under seal. ECF Dkt. #7-1 at 99. Petitioner filed a motion in limine to preclude Desiree Andaverde from testifying at trial. *Id.* at 100-09. The State opposed the motion in limine. *Id.* at 110-21. In addition, the State filed a motion for a *Daubert*

hearing to determine the admissibility of proposed defense expert witness Dr. Gregory Forgac. *Id.* at 122-24.

On March 23, 2009, the trial court held a hearing relative to the pending motion to dismiss and motion in limine. ECF Dkt. #7-1 at 86. The hearing also proceeded on the State's motion for a *Daubert* hearing regarding Dr. Gregory Forgac, who offered his testimony. *Id.*

After the March 23, 2009 hearing, the State filed notice of subsequent authority. *Id.* at 87-89. On June 3, 2009, the trial court denied Petitioner's motion to dismiss and his motion in limine; the court reserved ruling on the *Daubert* issue for later. *Id.* at 90-98.

Regarding the State's motion for a *Daubert* hearing, Petitioner filed an oppositional response. ECF Dkt. #7-1 at 125-28. The State filed a reply. *Id.* at 129-39. Petitioner filed a sur-reply. *Id.* at 140-48. The State responded in opposition to Petitioner's sur-reply. *Id.* at 149-54. On June 4, 2009, the trial court granted the State's motion to exclude expert testimony from Dr. Gregory Forgac. *Id.* at 155-59.

On March 26, 2009, the State filed notice of intent to use "prior acts" evidence. ECF Dkt. #7-1 at 160-64. Petitioner filed a motion for the State to specify the Ohio Evid.R. 404(b) exception that it was relying on. *Id.* at 165-67. The State filed a response under seal. *Id.* at 168.

On May 14, 2009, Petitioner filed a motion in limine to exclude evidence of prior bad acts under seal. ECF Dkt. #7-1 at 169. The State filed a response under seal. *Id.* at 170.  On June 8, 2009, the trial court held a hearing and denied Petitioner's motion to specify as moot and denied Petitioner's motion in limine to exclude prior bad acts evidence. *Id.* at 171.

Petitioner filed a notice of intent to introduce evidence under the "recorded recollections" exception of [Ohio Evid.]R. 803(5). ECF Dkt. #7-1 at 172-75. In response, the State filed a motion in limine to preclude the use of a "Clay Township Supplemental Report" to impeach Witness Desiree Andaverde. *Id.* at 176-84. On June 9, 2009, the trial court held a hearing and denied the State's motion in limine. *Id.* at 185.

Petitioner also filed a motion in limine to limit testimony of Dr. Marcy Martelli. ECF Dkt. #7-1 at 186-88. The trial court heard arguments pertaining to Petitioner's motion to limit testimony of Dr. Martelli during its June 8, 2009 hearing. It denied the motion as moot because the parties represented agreement of the limited scope of Dr. Martelli's testimony. *Id.* at 171.

Petitioner also filed a notice of intent to call Dr. Solomon Fulero at trial to provide expert testimony regarding general theory of human, post-event assimilation, interview protocols, and suggestibility. ECF Dkt. #7-1 at 189-90.

Petitioner's case proceeded to jury tria1, and the State filed proposed jury instructions. ECF Dkt. #7-1 at 191-93. After the State rested its case, Petitioner moved for a judgment of acquittal pursuant to Ohio Crim.R.29 and renewed his Ohio Crim.R.29 acquittal motion after the defense rested. *Id.* at 194. The trial court denied both of Petitioner's motions for acquittal. *Id.*

On June 17, 2009, the jury found Petitioner guilty of murder in the first degree, and the trial court sentenced Petitioner to 15-years to Life in prison. ECF Dkt. #7-1 at 195-96. On July 16, 2009, the trial court journalized a Nunc Pro Tunc sentencing entry that corrected Petitioner's sentence to reflect that Petitioner had been convicted of an unclassified felony, not a first-degree felony; otherwise, Petitioner's 15 years to Life prison sentence remained the same. *Id.* at 197-99.

12

B.      **Direct Appeal**

On July 8, 2009, Petitioner, through appellate counsel, filed a timely notice of appeal to the Sixth District Court of Appeals. ECF Dkt. #7-1 at 200-01. In his appellate brief, filed on January 24, 2011, Petitioner raised the following assignments of error:

1.      Zich's federal and state constitutional rights to a speedy trial and to due process were violated by the State's delayed prosecution.

2.      The trial court erred by allowing the state to call 3 of Zich's ex-wives as witnesses who offered evidence of other crimes, wrongs, or acts to prove character.

3.      Zich's right to a fair trial was violated when the trial court allowed a lay witness to offer expert testimony regarding rope comparison, and similarly asked the coroner for an opinion after admitting she was not an expert in the area.

4.      Zich's conviction was against the manifest weight of the evidence.

5.      There was insufficient evidence to convict Zich of murder.

6.      Zich was deprived of his constitutional right to effective assistance of counsel.

7.      The Lucas County Court of Common Pleas lacked venue, and Zich's Crim.R. 29 motion to dismiss on that basis should have been granted.

8.      The trial court abused its discretion through several evidentiary rulings during trial which cumulatively prevented Zich from having a fair trial.

ECF Dkt. #7-1 at 202-40.

The State filed a brief in opposition. ECF Dkt. #7-1 at 244-84. Petitioner filed a reply brief. *Id.* at 285-96. The State filed a motion to strike Petitioner's reply brief or to permit the State leave to respond. *Id.* at 297-302. Petitioner filed an oppositional response. *Id.* at 303-07. On August 9, 2011, the state appellate court denied the State's motion and permitted the State to address the arguments in Petitioner's reply brief in oral argument that it considered new. *Id.* at 308.

13

The State filed a notice of intent to rely upon authority at oral arguments. ECF Dkt. #7-1 at 309-11. On December 16, 2011, the state appellate court overruled Petitioner's assignments of error and affirmed the judgment of the trial court. *Id.* at 312-55.

Petitioner, through counsel, timely appealed to the Supreme Court of Ohio, and he amended his notice of appeal once. ECF Dkt. #7-1 at 630-32. In his memorandum in support of jurisdiction filed on January 26, 2012, Petitioner asserted the following propositions of law:

1.      Zich's right to due process pursuant to the Fourteenth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution was violated. This includes the failure of the lower courts to grant Zich's Motion to Dismiss, and permitting the state to offer Crim.R. 404(b) evidence.

2.      Zich's substantive and procedural rights to due process, confrontation of witnesses and equal protection, as set forth in the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, were also violated by the state's delayed prosecution and the trial court's evidentiary rulings.

ECF Dkt. #7-1 at 633-46. The State filed a memorandum in opposition. *Id.* at 689-706. On April 18, 2012, the Supreme Court of Ohio declined to accept jurisdiction. *Id.* at 707.

### C.      Post-Conviction Relief

On October 8, 2010, through his appellate counsel, Petitioner filed a motion to order sealing of petition to vacate conviction or set aside sentence pursuant to O.R.C. §2953.21 in the trial court. ECF Dkt. #7-1 at 388-89. In his petition to vacate conviction or set aside sentence, Petitioner asserted the following causes of action in his post-conviction relief petition: 1) actual innocence; 2) violation of *Brady v. Maryland*, 373 U.S. 83 (1963); 3) right to present a defense; 4) restriction of confrontation; 5) ineffective assistance of counsel; and 6) constitutional challenge to Ohio's post-conviction procedures. *Id.* at 485.

14

The trial court granted Petitioner's motion to order sealing of petition. ECF Dkt. #7-1 at 390-91. Petitioner also filed a motion to order sealing of stay of post-conviction relief action during his pending direct appeal, which the trial court granted. *Id.* at 392-93; 394-95.

The State filed an oppositional response to Petitioner's petition to vacate his conviction or set aside his sentence; the State requested the court deny the motion, or, in the alternative, enter summary judgment against his claims. ECF Dkt. #7-1 at 396-423. Petitioner filed a response, and the State filed a reply. *Id.* at 424-45; 446-60. The trial court held a hearing on March 22, 2013 on Petitioner's petition to vacate conviction and set aside sentence that was filed on October 8, 2010. *Id.* at 461. The trial court ordered simultaneous briefs to be filed. *Id.* Subsequently, Petitioner filed a supplemental brief in support of his petition to vacate conviction or set aside sentence. *Id.* at 462-74. The State also filed a post-hearing brief. *Id.* at 475-83. On September 8, 2015, the trial court overruled and denied Petitioner's petition for post-conviction relief; the trial court also overruled and denied Petitioner's request to conduct discovery and for an evidentiary hearing. *Id.* at 484-513.

Petitioner appealed the trial court's September 8, 2015 decision to the Sixth District Court of Appeals. ECF Dkt. #7-1 at 514-15. In his appellate brief, field on March 1, 2016, Petitioner raised the following assignments of error:

1.  The use of res judicata is not only an improper use of the doctrine, but it unconstitutionally restricts Zich's access to have his conviction fully redressed in state court. The inadequate remedy at law provided by Ohio's post-conviction law violates his rights under the Fourteenth, Sixth and Eighth Amendments of the United States Constitution and Article I, Section 9, 10 and 16 of the Ohio Constitution.

2.  The trial court erred by not addressing the issue of actual innocence and thereby violated Zich's 6th Amendment right to effective assistance of counsel as well as

his Constitutional right to a fair trial. Further, the trial court incorrectly refused to hear the actual innocence claim which is also intertwined with his argument that the state committed violations of *Brady v. Maryland*. This violates Zich's constitutional right to Due Process of Law as created by the Fourteenth Amendment.

3.    R.C. 2953.21 violates the Due Process Clause as well as the Fourteenth Amendment and Sixth and Eighth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution because it fails to give Zich an adequate collateral attack on his conviction.

*Id.* at 516-50. The State filed an appellate brief. *Id.* at 582-611. Petitioner then filed a reply. *Id.* at 612-13[2]. The State filed a notice of additional relevant authority. *Id.* at 614-15. On February 3, 2017, the court of appeals affirmed the trial court's decision denying Petitioner's petition for post-conviction relief and granting summary judgment to the State. *Id.* at 616-29.

Petitioner, through counsel, timely appealed to the Supreme Court of Ohio, and he amended his notice of appeal once. ECF Dkt. #7-1 at 356-59. In his memorandum in support of jurisdiction filed on March 16, 2017, Petitioner asserted the following propositions of law:

1.    The Doctrine of Res Judicata is applied improperly in Ohio's post-conviction relief procedure and unconstitutionally restricts Zich's access to have his conviction fully redressed in state court. The inadequate remedy at law provided by Ohio's post-conviction law under R.C. 2953.21, *et seq.*, violates his rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, Sixth and Eighth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution.

2.    The trial court erred by not addressing the issue of actual innocence and thereby violated Zich's Sixth Amendment right of ineffective assistance of counsel as well as his Constitutional right to a fair trial. Further, the trial court incorrectly refused to hear the actual innocence claim which is also intertwined with his argument that the State violated *Brady v. Maryland*. This violates Zich's constitutional right to Due Process of Law as created by the Fourteenth Amendment.

---

[2] It appears that the full reply brief filed by Petitioner is not included in the record. *See* ECF Dkt. #7-1 at 612-13.

3.      R.C. 2953.21 violates the Due Process Clause as well as the Fourteenth Amendment and Sixth and Eighth Amendments to the United States Constitution and Article I, Sections 9, 10, and 16 of the Ohio Constitution because it fails to give Zich an adequate collateral attack on his conviction.

ECF Dkt. #7-1 at 360-74. The State filed a memorandum in opposition. *Id.* at 375-86. On

November 1, 2017, the Supreme Court of Ohio declined to accept jurisdiction. *Id.* at 387.

## III.      FEDERAL HABEAS CORPUS PETITION UNDER 28 U.S.C. § 2254

On October 31, 2018, Petitioner, through counsel, filed the instant petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. ECF Dkt. #s 1, 1-2. In his instant petition, Petitioner,

presents the following grounds for relief:

1.      The State's delayed prosecution deprived Zich of his constitutional due process rights, including his right to a speedy trial, to confront witnesses, and to present a defense.

2.      Zich was deprived of his constitutional right to effective assistance of counsel.

3.      The State failed to provide trial counsel with exculpatory evidence in violation of his constitutional rights.

4.      Ohio's post-conviction statute violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

5.      The trial court violated Zich's constitutional rights by failing to address his claim of actual innocence.

ECF Dkt. #s 1, 1-2. Petitioner included supporting facts and detailed arguments in his addendum,

which acts as a merits brief, and he also included ground five in his addendum even though it was

not in his original petition. *See* ECF Dkt. #s 1, 1-2. Petitioner requested the Court to grant his writ

of habeas corpus and direct Respondent to immediately release Petitioner from custody. ECF Dkt.

#1.

On December 14, 2018, this case was referred to the undersigned pursuant to L.R. 72.2. On February 22, 2019, Respondent filed a return of writ. ECF Dkt. #7. Petitioner then filed a traverse. ECF Dkt. #10.

## IV.     APPLICABLE LAW

### A.     Procedural Barriers to Review

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus. Justice O'Connor noted in *Daniels v. United States*: "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381, 121 S. Ct. 1578, 1583, 149 L. Ed. 2d 590 (2001) (citing *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

#### 1.     Statute of Limitations

The AEDPA statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final. 28 U.S.C. § 2244(d)(1). The AEDPA statute of limitations is not at issue in this case.

#### 2.     Exhaustion of State Remedies

Subject to the statute of limitations, federal habeas corpus relief is only available to persons that are in custody in violation of the United States Constitution, laws or treaties. 28 U.S.C. § 2254(a); *Engle v. Isaac*, 456 U.S. 107, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982); *Smith v. Phillips*, 455 U.S. 209, 221, 102 S. Ct. 940, 948, 71 L. Ed. 2d 78 (1982). Generally, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see Baldwin v. Reese*,

18

541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004); *Wilson v. Mitchell*, 498 F.3d 491, 498 (6th Cir. 2007). Exhaustion is required before a state prisoner may bring a habeas corpus petition under either 28 U.S.C. § 2241 or 28 U.S.C. § 2254. *See Collins v. Million*, 121 Fed. Appx. 628, 630-31 (6th Cir. 2005). The petitioner bears the burden of proving exhaustion. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Also, the court of appeals may raise and consider the issue of exhaustion sua sponte. *Clinkscale v. Carter*, 375 F.3d 430, 438 (6th Cir. 2004) (citing *Harris v. Rees*, 794 F.2d 1168, 1170 (6th Cir. 1986)). Exhaustion does not require a state court adjudication on the merits of the claim at issue. *Clinkscale*, 375 F.3d at 438 (citing *Smith v. Digmon*, 434 U.S. 332, 333, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978)); *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990)).

The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts," which means "the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006) (citing *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)); *see O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731, 144 L. Ed. 2d 1 (1999); *Wilson v. Mitchell*, 498 F.3d 491, 498-99 (6th Cir. 2007); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987). A petitioner will not be allowed to present claims never before presented in the state courts, unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 748, 111 S. Ct. 2546, 2564, 115 L. Ed. 2d

640 (1991) (citing *Engle v. Isaac*, 456 U.S. 107 (1982) and *Murray v. Carrier*, 477 U.S. 478 (1986)).

In addition to full presentation, a claim must also be fairly presented to the state courts as a federal constitutional issue rather than merely as a state law issue. *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). To exhaust a claim, a petitioner must present it to the state courts under the same theory that it is later presented in federal court. *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). For a claim to be "fairly presented," the petitioner must assert both a factual and legal basis for his claim in state court. *Fulcher v. Motley*, 444 F3d 791, 798 (6th Cir. 2006). A petitioner "fairly" presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (internal citation omitted); *McMeans*, 228 F.3d at 681 (citing *Franklin*, 811 F.2d at 326). Although general allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated, a petitioner is not required to recite "book and verse on the federal constitution." *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (citing *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *McMeans*, 228 F.3d at 681 (citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984)).

20

Originally, the Supreme Court interpreted 28 U.S.C. § 2254 as providing that if a petitioner did not fulfill the total exhaustion requirement, a district court *must* dismiss the habeas petition, even if it contained both unexhausted and exhausted claims *O'Sullivan v. Boerckel*, 526 U.S. 838, 852, 119 S. Ct. 1728, 1736, 144 L. Ed. 2d 1 (1999) (Stevens, J., dissenting) (emphasis added) (citing *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)); *cf.* 28 U.S.C. § 2254(b)(2) (stating that "a[n] application for a writ of habeas corpus *may* be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") (emphasis added). However, the Supreme Court became concerned about petitioners losing their opportunity for federal review when the AEDPA, which was enacted in 1996, included a one-year statute of limitations. *See Rhines v. Weber*, 544 U.S. 269, 274-75, 125 S. Ct. 1528, 1533, 161 L. Ed. 2d 440 (2005). Citing *Rhines*, the Sixth Circuit laid out the options that a district court may pursue in dealing with a mixed petition that contains unexhausted claims:

> When faced with this predicament in the past, we have vacated the order granting the writ and remanded the case to the district court so that it could do one of four things: (1) dismiss the mixed petition in its entirety, *Rhines*, 544 U.S. at 274, 125 S.Ct. 1528; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims, *id*. at 275, 125 S.Ct. 1528; (3) permit the petitioner to dismiss the unexhausted claims and proceed with the exhausted claims, *id.* at 278, 125 S.Ct. 1528; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit, 28 U.S.C. § 2254(b)(2).

*Harris v. Lafler*, 553 F.3d 1028, 1031-32 (6th Cir. 2009) (citing *Rockwell v. Yukins*, 217 F.3d 421, 425 (6th Cir. 2000)).

The AEDPA, as amended, provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C.A. § 2254(b)(2). Even assuming a state court remedy is available, the District Court may nevertheless consider a petitioner's unexhausted claim if the

claim lacks merit and returning to state court "would amount to a mere futility." *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001); *Rhines v. Weber*, 544 U.S. 269, 277, 125 S. Ct. 1528, 1533, 161 L. Ed. 2d 440 (2005).

### 3.      Procedural Default

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 2507, 53 L. Ed. 2d 594 (1977). In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 730, 111 S. Ct. 2546, 2554, 115 L. Ed. 2d 640 (1991). For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (emphasis removed)). Absent either cause and prejudice or a finding of actual innocence, a federal court is not required to reach the merits of claims that have been procedurally defaulted in state court by a state prisoner or in federal court by a federal prisoner in a defendant's direct criminal appeal. *See Reed v. Farley*, 512 U.S. 339, 354-55, 114 S. Ct. 2291, 2300, 129 L. Ed. 2d 277 (1994); *William v. Anderson*, 460 F.3d 789, 805-06 (6th Cir. 2006); *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 830 (6th Cir. 2005). Also, when the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). On the other hand, the Supreme Court has held that federal courts are not always required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S. Ct. 1517, 1523, 137 L. Ed. 2d 771 (1997) ("We do not

22

mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be. Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."). The Sixth Circuit has endorsed this view in *Hudson v. Jones* and proceeded to the merits in a habeas corpus proceeding when the question of procedural default presented a complicated question of state law and was unnecessary to the disposition of the case. *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *accord Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008), *as amended* (July 7, 2008).

In determining whether a state court has addressed the merits of a petitioner's claim, federal courts will apply a presumption that there is no independent and adequate state grounds for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S. Ct. 2546, 2554, 115 L. Ed. 2d 640 (1991) (citing *Michigan v. Long*, 463 U.S. 1032, 1040-41, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)); *see also Harris v. Reed*, 489 U.S. 255, 262-63, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989) (holding that the "plain statement" rule of *Michigan v. Long* applies to federal habeas review). However, the presumption:

> does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman*, 501 U.S. at 735 n.1; *see Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir.2006)) ("[A] claim is procedurally defaulted

where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.").

Prior to the Supreme Court's ruling in *Coleman*, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). Under the *Maupin* test, a reviewing court must decide:

(1)     whether the petitioner failed to comply with an applicable state procedural rule;

(2)     whether the state courts actually enforced the state procedural sanction;

(3)     whether the state procedural bar is an "adequate and independent" state ground in which the state can foreclose federal review; and

(4)     if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418-20 (6th Cir. 2006). The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005), *vacated on other grounds in Bradshaw v. Richey*, 546 U.S. 74 (2005), *remanded to Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007); *Franklin*, 434 F.3d at 420.

Under the second prong, the last-explained state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's

24

federal claims. *See Coleman v. Thompson*, 501 U.S. 722, 735, 111 S. Ct. 2546, 2554, 115 L. Ed. 2d 640 (1991); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises) (superseded by statute as stated in *Parker v. Matthews*, 567 U.S. 37 (2012) on different grounds); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply). Although the Sixth Circuit has required express reliance on a procedural bar in the past, *see Baze*, 371 F.3d at 320, it has also assumed such reliance when the decision "fairly appears to rest on state law." *Smith v. Warden, Toledo Corr. Inst.*, No. 17-3220, 2019 WL 2518311, at *11 (6th Cir. June 18, 2019) (citing *Coleman*, 501 U.S. at 740).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Wilson v. Mitchell*, 498 F.3d 491, 499 (6th Cir. 2007); *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus, unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Geneva v. Lazaroff*, 77 Fed. Appx. 845, 850 (6th Cir. 2003); *see also Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986) (Demonstrating

25

"the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527, 533, 106 S. Ct. 2661, 2666, 91 L. Ed. 2d 434 (1986); *Geneva*, 77 Fed. Appx. at 850. A petitioner can also show that a fundamental miscarriage of justice will occur if the Court does not address his procedurally defaulted ground for relief. *Schlup v. Delo*, 513 U.S. 298, 321 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995); *Coleman*, 501 U.S. at 750. The Supreme Court described the fundamental miscarriage of justice exception as follows:

> To ensure that the fundamental miscarriage of justice exception would remain "rare" and would only be applied in the "extraordinary case," while at the same time ensuring that the exception would extend relief to those who were truly deserving, the Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.

*Schlup*, 513 U.S. at 321. Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004). In addition, the Sixth Circuit recognized Ohio's rule that claims must be raised on direct appeal, if possible, or else res judicata bars their litigation in subsequent proceedings. *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013) (citing *State v. Perry*, 226 N.E.2d 104, 108 (1967)).

**B.**    **Standard of Review**

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, the AEDPA governs this Court's review of the instant case for the reasons

26

previously discussed and because Petitioner filed his petition well after the Act's effective date of

April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112

(1998); *see* ECF Dkt. #1. As previously stated, under Section 2254, a state prisoner is entitled to

relief if he is held in custody in violation of the United States Constitution or laws or treaties of

the United States. 28 U.S.C. § 2254(d).

      The AEDPA sets forth the standard of review for the merits of a petition for the writ of

habeas corpus. The AEDPA provides a deferential standard of review as follows:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> > (1)     resulted in a decision that was *contrary to*, or involved an
> > *unreasonable application of*, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

28 U.S.C. §2254(d) (emphasis added). In *Williams v. Taylor*, the Supreme Court clarified the

language of 28 U.S.C. §2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this Court on a question of
> law or if the state court decides a case differently than this Court has on a set of
> materially indistinguishable facts. Under the "unreasonable application" clause, a
> federal habeas court may grant the writ if the state court identifies the correct
> principle to the facts of the prisoner's case.

529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). Furthermore, the Supreme Court

declared that "a federal habeas court making the 'unreasonable application' inquiry should ask

whether the state court's application of clearly established federal law was objectively

unreasonable." *Id.* Elaborating on the term "objectively unreasonable," the Court stated that "a

federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001); *Earhart v. Konteh,* 589 F.3d 337, 343 (6th Cir. 2009).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A. Decisions of lower federal courts may not be considered.

B. Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C. The state court decision may be overturned only if:

    1. It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

    2. the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

    3. 'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

    4. the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D. Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable. That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' 'An unreasonable application of

28

federal law is different from an incorrect or erroneous application of federal law.'

E.   Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted); *see Casnave*

*v. Lavigne*, 169 Fed. Appx. 435, 438-39 (6th Cir. 2006).

Finally, a reviewing federal court is bound by the presumption of correctness, under which

the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules

of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221

(1985); *see Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986). The presumption of correctness

is set forth in 28 U.S.C. § 2254(e), which provides:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e). The presumption of correctness applies to basic, primary, or historical facts,

and not to mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-12, 116 S.

Ct. 457, 133 L. Ed. 2d 383 (1995). The presumption also applies to "implicit findings of fact,

logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and

credibility." *Id.*; *see McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014) (citing *Thompson*,

516 U.S. at 111). Furthermore, a reviewing federal court is not free to ignore the pronouncement

of a state appellate court on matters of law. *See Central States, Southeast & Southwest Areas*

*Pension Fund v. Howell*, 227 F.3d 672, 676 n.4 (6th Cir. 2000). Petitioner has the burden of

rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

29

## V.    ANALYSIS

Petitioner raised five grounds of relief in his instant petition for a writ of habeas corpus. ECF Dkt. #s 1, 1-2. The undersigned will address each ground separately.

### A.    GROUND ONE

Petitioner's first ground of relief is:

1.    The State's delayed prosecution deprived Zich of his constitutional due process rights, including his right to a speedy trial, to confront witnesses, and to present a defense.

ECF Dkt. #s 1, 1-2.

Respondent admits, and the undersigned finds, that Petitioner's first habeas ground has been fully exhausted. *See* ECF Dkt. #7 at 31. Petitioner included this ground of relief in his direct appeal to the court of appeals and the Supreme Court of Ohio. *See* ECF Dkt. #7-1 at 203, 635. The state appellate court, the last reasoned state court, denied Petitioner's claims for this issue on the merits and in accordance with clearly established Supreme Court precedent and state law. *Id.* at 312-55.

A federal court sitting in habeas corpus review is bound by a state court's interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 604, 163 L. Ed. 2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (internal citations omitted). Likewise, the AEDPA compels this court to defer to the state appellate court's determination unless it resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law …" or "resulted in a decision that was based on an unreasonable determination of the facts …." 28 U.S.C. § 2254(d).

"[B]efore arrest or indictment, when the suspect remains at liberty – statutes of limitations provide the primary protection against delay, with the Due Process Clause as a safeguard against fundamentally unfair prosecutorial conduct." *Betterman v. Montana*, 136 S.Ct. 1609, 1613, 194 L. Ed. 2d 723 (2016) (citing *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)). The Sixth Amendment right to a speedy trial does not attach until a defendant is arrested or formally accused and the right detaches upon conviction. *Id.* (citing *United States v. Marion*, 404 U.S. 307, 320-321, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). "[I]n no event does the right to speedy trial arise before there is some charge or arrest, even though the prosecuting authorities had knowledge of the offense long before this." *Marion*, 404 U.S. at 462-463.

Pre-indictment delay may, however, give rise to a Due Process claim under the Fifth Amendment or a claim under an applicable statute of limitations. *United States v. MacDonald*, 456 U.S. 1, 7, 102 S. Ct. 1497, 1501, 71 L. Ed. 2d 696 (1982) (citing *Lovasco*, 431 U.S. at 788-789). A petitioner may present an actionable Due Process violation of the Fifth Amendment "if it were shown at trial [(1)] that the pre-indictment delay … caused substantial prejudice to [Petitioner's] rights to a fair trial[; and (2)] that the delay was an intentional device to gain tactical advantage over the accused." *Marion*, 404 U.S. at 324 (internal citations omitted). A pre-indictment delay that "is investigative rather than intended to gain a tactical advantage over the accused, … does not offend the Fifth Amendment." *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992) (citing *Lovasco*, 431 U.S. at 795). In addition, a prosecutor abides by the standards of "fair play and decency … if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Lovasco*, 431 U.S. at 795.

31

Petitioner's first ground of relief stems from the fact that the victim's body was discovered on December 18, 1991, but Petitioner was not indicted for her murder until June 1, 2007, approximately 15 and a half years later. ECF Dkt. #10 at 27. Petitioner sets forth several arguments to support his first ground for relief, all of which he presented on appeal and which were addressed by the appellate court. ECF Dkt. #1-2 at 2-3 (habeas corpus addendum with supporting arguments); #10 at 30-33 (Petitioner's reply brief); #7-1 at 228-32 (Petitioner's appellate brief).

In its December 16, 2011 decision, the appellate court determined the issue as follows:

{¶64} Appellant, in his first assignment of error, argues that the 16 year delay between the commission of the offense and the bringing of the indictment in this case resulted in actual and substantial prejudice to appellant, thereby depriving appellant of his right to due process.

{¶65} This court, in *State v. Robinson*, 6th Dist. No. L-06-1182, 2008 Ohio 3498, set forth as follows the law governing preindictment delay:

{¶66} "[A]n unjustifiable preindictment delay that results in actual prejudice to a defendant 'violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," * * * and which define "the community's sense of fair play and decency" * * *', and, thus, effectively deprives a defendant of his right to due process of law under Section 16, Article I of the Ohio Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. *State v. Luck* (1984), 15 Ohio St.3d 150, 159, 15 Ohio B. 296, 472 N.E.2d 1097, paragraph two of the syllabus; *United States v. Lovasco* (1977), 431 U.S. 783, 790, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (citations omitted); see, also, *State v. Lewis*, 4th Dist. No. 00CA10, 2001 Ohio 2496.

{¶67} "To determine whether an indictment should be dismissed as a result of a preindictment delay, the Supreme Court of Ohio, in *State v. Luck*, supra, adopted a test first used by the United States Supreme Court in *United States v. Lovasco*, supra, and *United States v. Marion* (1971), 404 U.S. 307, 92 S. Ct. 455, 30 L. Ed. 2d 468. That test, as set forth in *Luck*, supra, is as follows:

{¶68} "The defendant must first demonstrate that the delay caused actual prejudice to his defense. Id., at 157-158. Once the defendant makes this showing of actual prejudice, the burden then shifts to the state to prove that the reasons for the delay were justifiable. Id., at 158. The court then views the prejudice suffered by the defendant in light of the state's reason for the delay in order to make a determination as to whether the delay resulted in a violation of the defendant's due process rights. Id., at 154.

32

{¶69} "To prove actual prejudice, a defendant must show, by concrete proof, the exculpatory value of any alleged missing evidence. See, *State v.* Gulley (Dec. 20, 1999), 12th Dist. No. CA99-02-004, 1999 Ohio App. LEXIS 6091, citing *United States v. Doerr* (C.A. 7, 1989), 886 F.2d 944, 964; *State v. Lewis*, supra, citing *State v. Flickinger* (Jan. 19, 1999), 4th Dist. No. 98CA09, 1999 Ohio App. LEXIS 225; see, also, *State v. Brown*, (Mar. 17, 2000), 4th Dist. No. 98CA25, 2000 Ohio App. LEXIS 1203, citing *United States v. Marion*, supra. In other words, a defendant must show how lost witnesses and physical evidence would have proven the defendant's asserted defense. See *State v. Gulley*, supra; *State v. Davis*, 7th Dist. No. 05 MA 235, 2007 Ohio 7216, ¶ 17. ('Without proof of prejudice, meaning something which adversely affects [a defendant's] ability to defend himself at trial, there is no due process violation for preindictment delay in prosecution.'). A showing based on mere speculation will not be found sufficient. See *State v. Gulley*, supra; *State v. Brown*, supra. In addition, '[p]rejudice will not be found due to the lack of non-exculpatory evidence.' *State v. Gulley*, supra. FN17

{¶70} "FN17. Missing evidence that does not necessarily exculpate a defendant and, therefore, cannot support a finding of actual prejudice, may still be used to attack the credibility of the state's evidence. *State v. Gulley*, supra. In addition, issues concerning why the evidence is missing and what the evidence would have shown may well be relevant to trial. Id.

{¶71} "The court, in deciding whether the prejudice that is established by a defendant constitutes 'actual prejudice,' must balance the claimed prejudice against the remaining evidence in the case, including any newly discovered evidence, to determine whether the missing evidence would have minimized or eliminated the impact of the state's evidence. See *State v. Luck*, 15 Ohio St.3d at 154, 157; see, also, *State v. Brown*, supra. Ultimately, the determination of whether there has been 'actual prejudice' involves 'a delicate judgment based on the circumstances of each case.' *United States v. Marion* (1971), 404 U.S. at 325; *State v. McClutchen*, 8th Dist. No. 81821, 2003 Ohio 4802, ¶ 11.

{¶72} "If the defendant fails to meet his burden of establishing actual prejudice – that is, if the court determines that the missing evidence would not have significantly minimized or eliminated the impact of the state's evidence – the inquiry ends and the matter is concluded. If, however, the defendant meets his burden of establishing actual prejudice, the court must go on to determine whether there was any justifiable reason for the delay in prosecution that caused the prejudice. *State v. Luck*, 15 Ohio St.3d at 158.

{¶73} "According to the court in *Luck*, '[A] delay in the commencement of prosecution can be found to be unjustifiable when the state's reason for the delay is to intentionally gain a tactical advantage over the defendant * * * or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased.' Id. The court additionally noted that '[t]he length of delay will normally be the key

factor in determining whether a delay caused by negligence or error in judgment is justifiable.' Id.

{¶74} "If the court, upon viewing the prejudice suffered by the defendant in light of the state's reason for the preindictment delay, finds that the delay was unjustifiable and has resulted in actual prejudice to the defendant, such that he has been deprived of his due process rights, the indictment against the defendant will be dismissed. See *Luck*, supra. In making this determination, a court should bear in mind 'some prejudice' to a defendant occurring from evidence lost over the years does not deprive him of due process; rather, in order for a defendant to be deprived of due process, the prejudice must be substantial. See *State v. Walls*, 96 Ohio St.3d 437, 2002 Ohio 5059, 775 N.E.2d 829; ¶ 56; *Lovasco*, 431 U.S. at 796 ('To prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.')" Id. at ¶ 118 -125.

{¶75} In the instant case, appellant claims that he was prejudiced by the destruction of records made by two psychologists who interviewed Desiree in the early 1990s, following Mary Jane's death. Specifically, appellant claims that the destruction of records denied him an opportunity to prove "manipulation of [the homicide investigation] by the family and police."

{¶76} According to appellant, one of the psychologists, Arlynn H. Lyle, told police that she could not verify either that Desiree's memories were authentic or that they were the result of coaching. It is undisputed that by 2007, Lyle had no recollection of the case and did not have any records pertaining thereto. According to one police report, Desiree at one point told Lyle, "I know who killed my mom," but then followed with, "I can't tell."

{¶77} The second psychologist, Marcie Martelli, likewise had no recollection of the case and no records of her interviews with Desiree. Desiree, according to a second police report, told Martelli that appellant killed her mother. The same report indicates that on one occasion when Desiree was asked how she knew that appellant killed her mother, she stated, "That's what everyone told me," but on another occasion she answered, "I was there when it happened."

{¶78} Upon our review of the foregoing, we find that appellant has failed to demonstrate, by concrete proof, the exculpatory value of the missing records. See *State v. Gulley*, supra; *State v. Lewis*, supra. At best, these records would have served to impeach testimony of witnesses for the prosecution. Indeed, the most likely use of the records would have been to impeach Desiree's testimony, but Desiree did not testify. As indicated above, "[p]rejudice will not be found due to the lack of non-exculpatory evidence." *State v. Gulley*, supra (evidence going to the credibility of the state's evidence is a matter best left for trial).[3]

---

[3] Paragraphs 75 through 78 of the court of appeals' December 16, 2011 decision coincide with Petitioner's instant habeas argument labeled number "1" found in both his reply brief and in the addendum to his petition for a writ of

{¶79} Appellant additionally states that he was prejudiced by the absence of Tennyson Center reports. According to appellant, Clay Township Police reports reflect that the Tennyson Center, a substance abuse treatment center, was "apparently familiar" with Mary Jane, but that she was not at the treatment center in December 1991. Appellant further states that by 2007, the Tennyson Center records were "long-destroyed."

{¶80} In light of the testimony by several witnesses in the case that in the months leading up to her death, Mary Jane did not appear to be under the influence of drugs, together with the coroner's toxicology screen, which showed no indications of drug use, we find that appellant has failed to show, by concrete proof, the exculpatory value of these missing records—especially when there is no information as to when Mary Jane was treated, for what problem, or for how long.

{¶81} Appellant further claims that he was prejudiced by the absence of "prior records of at least one other missing person's report for [Mary Jane] (9/4/82 until 9/8/82) [that] were no longer available." Again, in this instance, we find that appellant has failed to demonstrate beyond mere speculation the exculpatory value of any such record, which, by appellant's own admission, was made nearly ten years prior to Mary Jane's death and whose importance appellant asserts without offering any information in support of that assertion, e.g., information as to the circumstances giving rise to the alleged report.[4]

{¶82} Next, appellant asserts that "carpet and other items" removed from the Zich's house in 1991 "would have provided exculpatory evidence." He further complains that "it appears" that a "hair/fiber" that the coroner removed from Mary Jane's finger is missing.

{¶83} It is clear from appellant's argument that these missing items would have required additional testing to determine whether they would support appellant's defense. Any claim that the items are exculpatory is nothing more than mere speculation and, as such, is insufficient to establish actual prejudice. See *State v. Gulley*, supra; *State v. Brown*, supra.[5]

{¶84} Appellant further claims that he was prejudiced by the unavailability of certain witnesses. To establish a claim of prejudice due to the unavailability of witnesses who would be able to testify on a defendant's behalf, the defendant must: (1) identify the missing witnesses and the subject matter of their testimony; and (2)

habeas corpus. *See* ECF Dkt. #10 at 30-31; #1-2 at 2. This argument concerns findings by two child psychologists who evaluated Desiree, the victim's daughter who was 3-years-old at the time of the murder.

[4] Paragraphs 79 through 81 of the court of appeals' December 16, 2011 decision coincide with Petitioner's instant habeas argument labeled number "2" found in both his reply brief and in the addendum to his petition for a writ of habeas corpus. *See* ECF Dkt. #10 at 31; #1-2 at 2. This argument concerns unavailable records from the Tennyson Center for substance abuse treatment and a missing person's report for the victim.

[5] Paragraphs 82 and 83 of the court of appeals' December 16, 2011 decision coincide with Petitioner's instant habeas arguments labeled numbers "3" and "6" found in both his reply brief and in the addendum to his petition for a writ of habeas corpus. *See* ECF Dkt. #10 at 31-32; #1-2 at 2-3. This argument concerns physical evidence taken from a residence in 1991 and from the victim's finger.

explain how the missing evidence has impaired his defense. See *State v. Robinson*, supra, at ¶ 126.

{¶85} Among the witnesses who appellant claims were unavailable to testify on his behalf are unnamed "employees and patrons of the Oak Street Tavern" who, according to appellant, "could testify as to [Mary Jane's] reckless lifestyle and her double life." Here, appellant fails to specifically identify any of the individual employees and patrons whom he alleges would have provided the desired testimony. Thus, he has failed to establish a claim of prejudice due to the unavailability of these witnesses. See *State v. Robinson* at ¶ 126.

{¶86} Appellant does specifically identify two potential witnesses: (1) the owner of the Cozy Corner bar; and (2) Michael Guerrero. Appellant alleges that the owner of the Cozy Corner bar could have testified that Mary Jane "frequently had males stopping by to visit her," and, further, "quit on 11/13/91 and announced she was moving to Florida." As for Michael Guerrero, appellant cites a police report reflecting that Guerrero told them in 1991 that he had "observed a man follow [Mary Jane] out of the Oak Street Tavern just prior to Thanksgiving," and that Guerrero had given [Mary Jane] a $500 loan. Even if these two witnesses testified as anticipated by appellant, such testimony would not necessarily have exculpated appellant.[6]

{¶87} Appellant next offers in support of his claim of actual prejudice a pronouncement that "[t]he state's witnesses admitted to significant memory lapses from 1991." The law is well established that "the mere allegation of faded memory does not rise to the particularized demonstration of prejudice necessary to constitute an unconstitutional pre-accusation delay." *State v. Lewis*, supra.[7]

{¶88} Finally, appellant vaguely asserts that his case was prejudiced by the absence of records from a motel "where Montano and [Mary Jane] would stay." In making this assertion, appellant wholly fails to demonstrate the exculpatory value of the missing motel records. See *State v. Gulley*, supra; *State v. Lewis*, supra.[8]

{¶89} In determining whether appellant has sustained his burden to demonstrate "actual prejudice," it is necessary to consider the strength of the state's case, because a compelling case will require a higher level of prejudice to warrant

---

[6] Paragraphs 84 through 86 of the court of appeals' December 16, 2011 decision coincide with Petitioner's instant habeas arguments labeled numbers "4" and "8" found in both his reply brief and in the addendum to his petition for a writ of habeas corpus. *See* ECF Dkt. #10 at 31-32; #1-2 at 2. This argument concerns the inability to interview certain potential witnesses, including patrons from the Oak Street Tavern, an owner of a now-closed bar, and Michael Guerrero.

[7] Paragraph 87 of the court of appeals' December 16, 2011 decision coincides with Petitioner's instant habeas argument labeled number "5" found in both his reply brief and in the addendum to his petition for a writ of habeas corpus. *See* ECF Dkt. #10 at 31; #1-2 at 3. This argument concerns the State's witnesses' admissions of significant memory lapses from 1991.

[8] Paragraph 88 of the court of appeals' December 16, 2011 decision coincides with Petitioner's instant habeas argument labeled number "7" found in both his reply brief and in the addendum to his petition for a writ of habeas corpus. *See* ECF Dkt. #10 at 32; #1-2 at 3. This argument concerns missing records from a motel where the victim and her then-boyfriend Kenny Montano would stay together.

36

dismissal of the indictment. See *Luck*, supra, at 154, 157; *Brown*, supra. As indicated infra, in our analysis of appellant's fourth assignment of error, concerning the weight of the evidence in this case, the evidence of appellant's guilt was strong. In light of that evidence, we are compelled to conclude that any small amount of prejudice that may arguably have been suffered by appellant as the result of the missing evidence (and based upon our analysis above, we do not find that there was any such prejudice) did not constitute "actual prejudice." In this case, the unavailable witnesses, faded memories, and lost records and physical evidence would not necessarily have exculpated appellant. Instead, the missing evidence went to the credibility of the state's evidence, which was a matter best left for trial. See *State v. Gulley*, supra.

{¶90} Because appellant has failed to meet his burden of establishing substantial actual prejudice, we need not consider whether there was any justifiable reason for the delay in the prosecution of this case. Accordingly, appellant's first assignment of error is found not well-taken.

ECF Dkt. #7-1 at 328-36.

Petitioner argued both on direct appeal and in his instant habeas petition that the investigation was reopened by Toledo Police in 2007, but it was not based on any new evidence. ECF Dkt. #7-1 at 230; #10 at 29. Petitioner also asserts that "no evidence was offered at trial in this case that was not fully developed by investigators in 1991." ECF Dkt. #10 at 28. However, this Court is bound by the presumption of correctness of the state appellate court. 28 U.S.C. § 2254(e); *Thompson v. Keohane*, 516 U.S. 99, 107-12, 116 S.Ct. 457, 133 L. Ed. 2d 383 (1995). The factual recitation from the appellate court indicates that a cold case unit reopened the case "in 2004, after contact was made by one of Mary Jane's family members." ECF Dkt. #7-1 at 324 ¶46. After the case was reopened, further evidence was obtained, including, for example, information that Petitioner and Mary Jane had purchased several properties having joint deeds with rights of survivorship, a 2007 taped police interview with Petitioner, further DNA testing, and possibly also the testimony of Petitioner's three ex-wives, although it is unclear. *Id.* at 319, 323-25. While the investigation was reopened several years after 1991 due to the insistence of the victim's family members, police acquired further evidence during its investigation.

Without authority, Petitioner also asserts he was prejudiced by the State's leave to seek evidence from three of his ex-wives because there had been no discovery, none had testified at the grand jury, none were previously identified as witnesses, and his request to voir dire them was denied; therefore, he avers, he had neither the time nor opportunity to adequately prepare a defense against them. ECF Dkt. #10 at 32. Petitioner also advanced these arguments in his brief on direct appeal to the court of appeals. *See* ECF Dkt. #7-1 at 232. The appellate court addressed a slightly different issue concerning Petitioner's second appellate assignment of error, which was that the trial court erred by allowing the State to call three of the ex-wives to testify as to other crimes, wrongs, or acts that were committed by Petitioner. *See id.* at 232, 336-40. The court of appeals found that the admission of the testimony of the three ex-wives "was not in contravention of Evid.R. 403(A) and did not result in an abuse of discretion on the part of the trial court. Further— especially in light of the trial court's limiting instruction—we find that there is nothing in the record to suggest that the other acts testimony confused or misled the jury." *Id*. at 340 ¶102. The court considered Petitioner's eighth appellate assignment of error concerning issues with the trial court's evidentiary rulings. Specifically, the court of appeals stated:

> {¶148} Regarding voir dire of appellant's ex-wives, we note that appellant does not point to any information to be gained by questioning those women outside the presence of the jurors. Their testimony was the subject of extensive pre-trial briefing and arguments, and appellant identifies nothing that went beyond the parties' expectations.

ECF Dkt. #7-1 at 354. Since the court of appeals found no error related to the trial court permitting the three ex-wives the testify, the undersigned recommends the Court defer to the state court's determination and find this argument without merit.

In his habeas corpus petition, Petitioner argues that he was actually prejudiced by the fact that the State announced that Desiree would not testify the day before trial, robbing Petitioner's right to confront the sole witness that was before the grand jury. ECF Dkt. #10 at 32. Petitioner did not raise this argument on direct appeal. *See* ECF Dkt. #7-1 at 228-32. Petitioner raised this argument on post-conviction review to the trial court, and the trial court denied this argument as being without merit. *Id.* at 499-500. Petitioner did not raise a confrontation claim in his subsequent post-conviction appeals, and he has consequently failed to fairly present this issue. *Id.* at 360-74, 516-50. In addition, Petitioner filed a motion in limine to preclude Desiree from testifying at trial, and although the trial court denied the motion, Desiree did not testify at trial, as Petitioner initially wanted. *Id.* at 90-98, 100-09. While the State did not call Desiree to testify, nothing precluded Petitioner from calling her to the stand. The undersigned recommends that the Court find this argument not fairly presented and find it without merit by deferring to the trial court's ruling on the confrontation issue.

The state appellate court reasonably applied state law as it pertains to pre-indictment delay, and it determined that Petitioner failed to show the necessary "actual prejudice" that is required to show that he was deprived of due process. ECF Dkt. #7-1 at 328-36. This determination was also consistent with United States Supreme Court precedent. Petitioner has not shown that the state appellate court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent or was an unreasonable determination of the facts pursuant to the AEDPA. Accordingly, the undersigned recommends that the Court find that Petitioner's first ground of relief is without merit, and, consequently, deny and dismiss Petitioner's first habeas relief ground with prejudice.

**B.**     **GROUND TWO**

39

Petitioner's second ground of relief is:

2.      Zich was deprived of his constitutional right to effective assistance of counsel.

ECF Dkt. #s 1, 1-2. The parties dispute whether Petitioner has procedurally defaulted this ground for relief. *See* ECF Dkt. #s 7, 10.

On direct appeal, Petitioner raised a claim of ineffective assistance of trial counsel for three reasons: (1) by failing to file a motion to suppress his 2007 recorded interview by police and other "extraneous information"; (2) by failing to request access to grand jury transcripts; and (3) by ineffectively cross-examining trial witness Toledo Police Sergeant Steven Forrester. ECF Dkt. #7-1 at 237-38. On direct appeal, the appellate court addressed this assignment of error and each of the three reasons presented to it, concluding that his argument was not well-taken, as he failed to establish either error on the part of his counsel or prejudice arising from his counsel's performance. *Id.* at 348-53. On his discretionary direct appeal to the Supreme Court of Ohio, Petitioner did not raise a claim concerning ineffective assistance of counsel. *See id.* at 633-46.

In his post-conviction relief petition, Petitioner presented an ineffective assistance of trial counsel claim based upon: (1) alleged failure to investigate other suspects, including Michael Guerro and Tammy Harper; (2) failure to pursue records from the Tennyson Center related to the victim's alleged substance abuse treatment; (3) Kenny Montano's multiple failures to appear for scheduled interviews and his motive to commit murder if the victim had aborted his child; (4) an alleged failure to cross-examine Beverly Chancy thoroughly; (5) an alleged failure to undermine the State's theory of the case by not introducing testimony that Petitioner got a ride home from the Freeway Restaurant on the night after Thanksgiving or testimony from a neighbor that Desiree and the victim were present on the Saturday after Thanksgiving; (6) failure to pursue work records for

40

Petitioner that could be used to impeach Michele Mauder's testimony; and (7) failure to pursue the records of grand jury proceedings. ECF Dkt. #7-1 at 501. The trial court denied each of Petitioner's arguments. *Id.* at 501-10. On collateral appeal to the appellate court and Supreme Court of Ohio, Petitioner did not raise a stand-alone ineffective assistance of counsel claim; rather he raised distinct claims under trial court error theories. *See id.* at 361, 517-18.

In his instant habeas corpus petition and the addendum thereto, Petitioner claims trial counsel was ineffective due to: (1) failure to move to suppress Petitioner's 2007 taped interview with police and "extraneous information"; (2) failure to seek access to grand jury transcripts; (3) ineffectively cross-examining Sgt. Forrester; (4) failure to fully cross-examiner Tammy Harper[9]; (5) failure to rebut the victim's toxicology report with other evidence of a history of substance abuse or the possibility she was selling drugs; (6) ineffectively cross-examining Kenny Montano; (7) failure to properly cross-examine Petitioner's 3 ex-wives, including failing to cross-examiner Ms. Chancey at all, or failing to adequately seek exclusion of their testimony; (8) failure to properly challenge the State's proposed timeline; (9) failure to call Tim and Diane Jester as witnesses; and (10) failure to obtain Petitioner's work records. ECF Dkt. #1-2 at 3-5; #10 at 36-41.

Fair presentation requires the petitioner to present the same claim under the same theory to the state courts before raising it on federal habeas review. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987) (citing *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987)). The Sixth Circuit has already ruled on the precise issue before the undersigned; it has held that to be fairly presented, an ineffective assistance of counsel claim on federal habeas review must rely on the same underlying

---

[9] Petitioner details out how the jury only got one side of the story when there was other evidence the victim "had a history of disappearing, substance abuse, and reckless behavior, and that she was a regular patron of the Oak Street Tavern." ECF Dkt. #10 at 37-38; #1-2 at 3-4. However, the only apparent ineffective assistance-related allegation in this particular numbered reason was counsel's failure to fully cross-examine Tammy Harper. *Id.*

reasons as was presented to the state courts. *See Pillette*, 824 F.2d at 497-98 (finding, on habeas review, that petitioner did not fairly present his ineffective assistance of trial counsel claim to the state courts because his federal habeas petition relied on a different reason than what he alleged in his direct state appeal); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (finding procedural default where petitioner's ineffective assistance claim rested on a theory that was "separate and distinct from the one previously considered and rejected in state court."); *Wagner v. Smith*, 581 F.3d 410, 418–19 (6th Cir. 2009) (finding petitioner failed to exhaust a particular claim of ineffective assistance of counsel because while petitioner raised an ineffective assistance claim to the state supreme court, he never presented a specific reason (failure to object to evidence of uncharged homicides) to the state supreme court that he later brought in his habeas petition).

In addition, to meet the fair presentation requirement, the claim must have been presented to the state's highest court, which, in the instant case would be the Supreme Court of Ohio. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48, 119 S. Ct. 1728, 1731, 144 L. Ed. 2d 1 (1999) (holding that to satisfy the exhaustion requirement, prisoner was required to present his claims to Illinois Supreme Court before filing his petition for federal habeas relief, even though review by state Supreme Court was discretionary and one factor court was to consider in exercising its discretion was general importance of question presented); *Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006) (quoting *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)) ("The exhaustion 'requirement is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims.'").

Liberally construing the fair presentation requirement "same theory" requirement to encompass both Petitioner's direct appeal arguments and his post-conviction relief arguments,

42

Petitioner has failed to fairly present any of his ineffective assistance of counsel claims to the Supreme Court of Ohio. Therefore, the undersigned recommends that the Court find Petitioner has failed to meet the fair presentation requirement, and his claim is procedurally defaulted.

Petitioner points to *Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) for the proposition that his claim of ineffective assistance of counsel ("IAC") is not procedurally defaulted even if it is not raised on direct appeal because the claim "relies on evidence outside of the record." *See* ECF Dkt. #10 at 34. Petitioner argues he included new evidence from outside the trial court record including: (a) affidavit of Michael Scott; (b) supplemental report 094141-91; (c) transcript of Beverly Chancey's statement of January 31, 1992; (d) Chrysler work records; (e) Clay Township supplemental report with attached receipts from Forest City Auto Parts and time card for Diane Jester; (f) cold case homicide investigation report; and (g) Ottawa County missing person report. *Id.* at 34-35.

*Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) held that the petitioner's "guilt-phase IAC claim relies on evidence outside of the trial record and therefore was not defaulted when he failed to raise it on direct appeal." *Morales* and preceding cases have applied the "new evidence" rule in post-conviction proceedings where the state court refused to reach the merits of a claim by relying on a procedural bar, such as res judicata, despite new evidence that was competent, relevant and material. For example, in *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005), the petitioner raised a claim of IAC at the mitigation phase and, for support, introduced evidence outside the record in the form of a post-trial affidavit from the expert who testified during the mitigation phase and an affidavit from an additional expert. The *Hill* court disposed of the issue on the merits and held that the IAC claim was not procedurally defaulted because of evidence submitted outside the record. *Id.* In so holding, it concluded that the state court of appeals

43

improperly relied on res judicata as a procedural bar on post-conviction review. *Id.* at 320; *see White v. Mitchell*, 431 F.3d 517, 527 (6th Cir. 2005) (finding that habeas claim of IAC was not procedurally defaulted despite failing to raise it on direct state review, notwithstanding state postconviction court's determination of state procedural default, where state court's reliance upon res judicata appeared misplaced, inasmuch as that rule permitted raising of IAC claims for first time on state collateral review when claim relied on evidence outside the trial record.); *see also Smith v. Bagley*, No. 1:00 CV 1961, 2014 WL 1340066, at *53 (N.D. Ohio Apr. 3, 2014), *aff'd*, 642 Fed. Appx. 579 (6th Cir. 2016) ("In the cases in which the Sixth Circuit has followed *Hill*, the court has made it clear that *Hill* does not circumvent Ohio's res judicata doctrine by permitting habeas courts to reach the merits of any claim dismissed on res judicata grounds just because a petitioner presents some supporting evidence outside the record. Rather, the court disregarded the procedural bar only where the evidence at issue was competent, relevant and material, as the doctrine requires.").

In accordance with the aforementioned cases, the "new evidence" rule would only apply to the IAC claims (and specific reasons attached) in his post-conviction review and not the IAC claim (and three reasons) provided on direct appeal. However, the "new evidence" rule does not apply to Petitioner's post-conviction IAC claims. The state trial court reviewed each of Petitioner's reasons related to his IAC on the merits, except for the reason concerning grand jury records, which was denied under res judicata. ECF Dkt. #7-1 at 500-10. On post-conviction appeal, the appellate court stated the following:

> {¶17} Appellant advanced several additional ineffective assistance arguments. None of these arguments, save one, were decided on res judicata grounds. The only argument that was rejected by way of res judicata was appellant's argument that trial counsel was ineffective for failing to secure grand jury records.

44

{¶18} Relevant here, appellant previously raised this claim of ineffective assistance of trial counsel before this court in his direct appeal. *State v. Zich*, 6th Dist. Lucas No. L-09-1184, 2011-Ohio-6505, ¶ 124-142. Regarding his ineffective assistance claim, appellant argued, inter alia, that trial counsel was ineffective for failing to seek access to the grand jury transcripts. *Id.* at ¶ 136. We rejected this argument, stating:

> In making this argument, appellant expressly makes the presumption that the indictment was based upon testimony provided by Desiree. The argument rests on the assumption that the testimony by Desiree was impermissible, because she was very young at the time of her mother's death. We note that appellant, in making this argument, fails to support it with any legal analysis.

> Moreover, appellant's argument assumes that a question about the quality of the evidence offered to the grand jury justifies disclosure of proceedings. The Supreme Court of Ohio, however, has held that "[g]rand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts * * * unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982 (1981), paragraph two of the syllabus.

> ***

> Inasmuch as neither federal nor state law supports disclosure of transcripts based on speculation that the grand jury heard incompetent evidence, we find that trial counsel's failure to file a motion for disclosure premised on such speculation did not constitute error.

{¶19} In light of our prior resolution of appellant's ineffective assistance argument concerning the grand jury records in this case, the trial court found that appellant was barred by the doctrine of res judicata from raising such argument in his petition for postconviction relief. Because we find that this argument is identical to the argument we rejected [on direct appeal], we find no error in the trial court's application of res judicata. [citation omitted].

ECF Dkt. #7-1 at 623-24.

Essentially, all of the reasons given to support Petitioner IAC claims, whether on direct review or post-conviction review were disposed of on the merits by the state courts. The undersigned finds the court of appeals' reasoning for the IAC issue on post-conviction review adheres to the Sixth Circuit precedent discussed and raised by Petitioner in his brief. Petitioner has neither argued nor shown cause and prejudice to excuse his procedural default, and the undersigned

finds none. Accordingly, the undersigned recommends that the Court find that Petitioner failed to meet the fair presentation requirement and that habeas ground two is now procedurally defaulted.

### C.    GROUND THREE

Petitioner's third ground of relief is:

3.    The State failed to provide trial counsel with exculpatory evidence in violation of his constitutional rights.

ECF Dkt. #s 1, 1-2. Petitioner avers that the potentially exculpatory evidence includes grand jury irregularities, police reports of other suspects, a 1995 carpet sample, and therapy records from the victim's daughter, Desiree. ECF Dkt. #1-2 at 5; #10 at 41-44.

In his post-conviction petition, Petitioner's second cause of action alleged a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), which requires the State to provide defense trial counsel with exculpatory evidence. ECF Dkt. #7-1 at 485, 489. This cause of action was supported by the same four pieces of evidence he describes in his habeas corpus petition. The state trial court discussed each piece of evidence in turn, denying each claim. *Id.* at 489-97.

Specifically, it denied the grand jury and therapy records on res judicata grounds because the court of appeals on direct appeal addressed both pieces of evidence within its discussion of his ineffective assistance of counsel claims. *Id.* at 490-92, 494-97. Concerning the grand jury records, the trial court stated, in relevant part:

There is no evidence to support Petitioner's position that the victim's daughter testified in the grand jury proceedings or that her testimony prejudiced Petitioner in any way. Any such prejudice, if it existed, could have been resolved at trial by Petitioner calling the victim's daughter to the stand to testify. Neither the State nor the Petitioner called the victim's daughter as a witness at trial. The Sixth District's ruling on Petitioner's direct appeal found no prejudice. Thus, Petitioner's Brady claim as it relates to the grand jury records is without merit and DENIED.

ECF Dkt. #7-1 at 491-92. Regarding the therapy records, the trial court stated that: "Since the Sixth District Court of Appeals has already determined that the therapy records are not exculpatory evidence, Petitioner's *Brady* claim on the therapy records of the victim's daughter is barred by the doctrine of *res judicata*." *Id.* at 496.

The trial court in its post-conviction decision denied Petitioner's claims concerning other suspects and the carpet sample on the merits. ECF Dkt. #7-1 at 492-94. It stated that Petitioner failed to show any proof to support his assertion that the prosecutor actually withheld evidence of other suspects or that the defense was ignorant of the evidence. *Id.* at 292. It also stated that the missing carpet sample could not support a *Brady* violation claim because, even if the sample existed, it would require additional testing to determine whether it would assist Petitioner's defense or not. *Id.* at 493-94. The Sixth District Court of Appeals already determined that "any claim that the items are exculpatory is nothing more than mere speculation." *Id.* at 493 (citing id. at 334 ¶83).

Petitioner did not fairly present nor properly exhaust this claim to the court of appeals on his collateral appeal. In both his collateral appeals to the court of appeals and the Supreme court of Ohio Petitioner raised the following relevant assignment of error:

> 2.    The trial court erred by not addressing the issue of actual innocence and thereby violated Zich's 6th Amendment right to effective assistance of counsel as well as his Constitutional right to a fair trial. Further, the trial court incorrectly refused to hear the actual innocence claim which is also intertwined with this argument that the state committed violations of *Brady v. Maryland*. This violates Zich's constitutional right to Due Process of Law as created by the Fourteenth Amendment.

ECF Dkt. #7-1 at 361, 517. While on its face, this language appears to satisfy the fair presentment requirement, the substance of his arguments only discussed actual innocence and did not discuss exculpatory evidence, let alone the specific four pieces of exculpatory evidence his argument is based on. *See id.* at 368-69, 542-46.

47

The undersigned's position is also supported by the appellate court's treatment of Petitioner's second appellate assignment of error. The court of appeals' decision was responsive to Petitioner's fundamental actual innocence argument, and it found this error was not well-taken. ECF Dkt. #7-1 at 625-27. The court also rejected Petitioner's "assertion that his actual innocence claims should proceed because they are 'intertwined' with his argument that the state committed *Brady* violations," which were already decided on direct appeal and barred by res judicata. *Id.* at 627.

As previously discussed, fair presentation requires the petitioner to present the same claim under the *same theory* to the state courts before raising it on federal habeas review. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987) (citing *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987)) (emphasis added). Petitioner's collateral appellate arguments rested on a different theory (actual innocence) and lacked the same or remotely similar arguments concerning exculpatory evidence that he provided to the trial court on post-conviction review and to this Court in his habeas corpus petition.

Accordingly, the undersigned recommends that the Court find that petitioner failed to fairly present and fully exhaust Ground Three of his habeas petition and that it is procedurally defaulted. Even if the Court were to decide the issue on the merits, the Court should defer to the trial court's analysis on post-conviction review because it is not an unreasonable application of law or fact pursuant to AEDPA standards.

### D.    GROUND FOUR

Petitioner's fourth ground of relief is:

4.    Ohio's post-conviction statute violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

ECF Dkt. #s 1, 1-2. Petitioner raised the issue in Ground Four in his post-conviction petition at the trial court, court of appeals, and Supreme Court of Ohio levels; therefore, it is not procedurally defaulted. *See* ECF Dkt. #7-1 at 361, 485, 519. Petitioner avers that the trial court's application of res judicata during post-conviction review violated his constitutional rights by failing to provide a meaningful opportunity to present evidence and arguments to redress constitutional violations. ECF Dkt. #1-2 at 5.

The trial court addressed Petitioner's argument during collateral review. It applied Sixth Circuit and state precedent and denied his claim, finding it was without merit. ECF Dkt. #7-1 at 510-13. It concluded that, pursuant to precedent, Petitioner "provide[d] nothing more than conclusory allegations that the process is inadequate and thus unconstitutional[,] … [which] is insufficient to demonstrate operative facts to establish substantive grounds for relief." *Id.* at 513.

The court of appeals also addressed Petitioner's same arguments on appeal. *See* ECF Dkt. #7-1 at 621-25, 627-29. During his appeal, Petitioner argued that the doctrine of res judicata as it pertains to postconviction petitions should not apply to his claims of ineffective assistance of trial counsel. *Id.* at 621. As previously discussed, the court of appeals noted that all but one of Petitioner's IAC claims were decided on the merits on post-conviction review. *Id.* at 621, 623. It then upheld the trial court's application of res judicata on the one ground concerning grand jury transcripts, noting that the Petitioner already raised this claim in his direct appeal and was unsuccessful. *Id.* at 623-25.

In addressing his final assignment of error on post-conviction appeal, the court of appeals stated the following:

**D. Constitutionality of R.C. 2953.21**

49

{¶26} In his third assignment of error, appellant argues that R.C. 2953.21 fails to afford him an adequate collateral attack on his conviction and, therefore, violates his constitutional rights under the United States Constitution and the Constitution of the State of Ohio.

> "[S]tatutes enjoy a strong presumption of constitutionality." *State v. Cook*, 83 Ohio St.3d 404, 409, 700 N.E.2d 570 (1998). "An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 128 N.E.2d 59 (1955), paragraph one of the syllabus. All doubts regarding the validity of a statute "are to be resolved in favor of the statute." *State v. Gill*, 63 Ohio St.3d 53, 55, 584 N.E.2d 1200 (1992). The party seeking to have the statute declared unconstitutional bears the burden of proving beyond a reasonable doubt that the statute and a constitutional provision are incompatible. *State v. Warner*, 55 Ohio St.3d 31, 43-45, 564 N.E.2d 18 (1990).

{¶27} Here, appellant cites to several cases from the United States Court of Appeals for the Sixth Circuit allegedly "expressing frustration that Ohio's post-conviction law does not provide adequate relief as directed by the United States Supreme Court." Notably, appellant does not assert that the Sixth Circuit actually deemed R.C. 2953.21 to be unconstitutional. Moreover, in *State v. Lewis*, 8th Dist. Cuyahoga No. 73736, 1998 Ohio App. LEXIS 5777 (Dec. 3, 1998), the court examined this same argument and concluded:

> The Sixth Circuit Court of Appeals' dissatisfaction with Ohio's post-conviction relief process and the *Perry* decision does not require us to hold the post-conviction relief process invalid. *Perry* remains good law in this State. *See State v. Szefcyk*, 77 Ohio St.3d 93, 96, 671 N.E.2d 233 (1996). Furthermore, the post-conviction relief process has been held to be constitutionally sound. *See State v. Sklenar*, 71 Ohio App.3d 444, 594 N.E.2d 88 (9th Dist.1991). *Id.* at *11.

{¶28} In considering appellant's constitutional arguments, we are mindful of several Ohio appellate courts that have already rejected such arguments. *See State v. Cassano*, 5th Dist. Richland No. 12CA55, 2013-Ohio-1783, ¶ 32; *State v. La Mar*, 4th Dist. Lawrence No. 98 CA 23, 2000 Ohio App. LEXIS 1211 (Mar. 17, 2000); *State v. Murphy*, 10th Dist. Franklin No. 00AP-233, 2000 Ohio App. LEXIS 6129 (Dec. 26, 2000). Further, we note the fact that there is no constitutional right to postconviction state collateral review, even in death penalty cases. *Steffen*, supra, 70 Ohio St.3d at 410, 639 N.E.2d 67, citing *Murray v. Giarratano*, 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987).

{¶29} In light of the considerable case law upholding the constitutionality of Ohio's postconviction procedure set forth in R.C. 2953.21, we find appellant's constitutional argument unavailing. Accordingly, appellant's third assignment of error [is] not well-taken.

ECF Dkt. #7-1 at 627-29.

*State v. Perry*, 10 Ohio St.2d 175, 180, 226 N.E.2d 104 (1967), held that "[u]nder the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment." The Sixth Circuit recognized that Ohio's doctrine of res judicata is an adequate and independent state procedural ground upon which a state court in post-conviction proceedings may rely upon to bar consideration of claims. *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002); *see Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004) ("[T]his court has dismissed the contention that 'res judicata was an inadequate procedural bar ... because he was denied a reasonable opportunity to present his claims in state court,' and held that res judicata is an adequate and independent state ground for barring habeas review of constitutional claims.") (quoting *Coleman v. Mitchell*, 268 F.3d 417, 427, 429 (6th Cir.2001)); *see also McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir. 2013) (recognizing Ohio's rule that claims must be raised on direct appeal, if possible, or else res judicata bars their litigation in subsequent proceedings).

States have no constitutional obligation to provide post-conviction remedies and habeas corpus cannot be used to challenge a state's post-conviction relief scheme. *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (citing *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir.1986); *Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)). "[T]he essence

51

of habeas corpus is an attack by a person in custody upon the legality of that custody, and ... the traditional function of the writ is to secure release from illegal custody." *Kirby*, 794 F.2d at 246 (quoting *Preiser v. Rodriquez*, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)); 28 U.S.C. § 2254(a). A challenge to procedure relied upon during collateral proceedings is not a challenge on the underlying conviction, and therefore, is not cognizable on habeas review. *Henry v. Trim*, No. 1:11CV301, 2014 WL 763234, at *37 (N.D. Ohio Feb. 21, 2014) (citing Kirby, 794 F.2d 245).

Petitioner asserts that Ohio's post-conviction process, in practice, fails to provide a meaningful opportunity to present evidence and arguments to redress constitutional violations. ECF Dkt. #10 at 45-49. Such an attack is not cognizable on habeas review. Even if it were reviewable, the doctrine of res judicata, the specific aspect of Ohio's post-conviction statute that Petitioner challenges, has been long recognized and upheld by courts in this Circuit. Petitioner has not shown how the doctrine was improperly applied to a specific assignment of error in his post-conviction proceedings, nor does the undersigned find any error. Accordingly, the undersigned recommends that the Court dismiss Petitioner's habeas corpus Ground Four because it is not cognizable.

### E.    **GROUND FIVE**

Finally, Petitioner's fifth ground of relief is:

5.    The trial court violated Zich's constitutional rights by failing to address his claim of actual innocence.

ECF Dkt. #s 1, 1-2. Petitioner raised an actual innocence claim in his post-conviction petition at the trial court level. ECF Dkt. #7-1 at 485. The trial court rejected Petitioner's argument, reasoning:

[S]ince Ohio case law is clear that a claim for actual innocence is not cognizable in a post-conviction relief petition without a demonstration of a constitutional violation and is fundamentally a challenge to a conviction on grounds against the

manifest weight of the evidence, the Court finds that Petitioner's claim for actual innocence has failed to present a substantive ground for post-conviction relief and is barred by res judicata [because Petitioner did not raise the issue on direct appeal].

ECF Dkt. #7-1 at 487-88.

On collateral appeal to both the court of appeals and the Supreme Court of Ohio, Petitioner raised the issue in Ground Five. ECF Dkt. #7-1 at 361, 519. The court of appeals, which is the last-explained court, stated the following concerning Ground Five:

> {¶22} We recently addressed the issue of actual innocence in the postconviction context. In *State v. Willis*, 6th Dist. Lucas No. L-15-1098, 2016-Ohio-335, ¶ 19, 58 N.E.3d 515, we held that actual innocence is not a cognizable claim for postconviction relief. In reaching our conclusion, we relied upon the United States Supreme Court's decision in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). In that case, the Supreme Court held that "a claim of 'actual innocence' is not itself a constitutional claim." *Id.* at 404. "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Nevertheless, the court was willing to "assume, for the sake of argument in deciding [the] case, that a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.*
>
> {¶23} Courts have interpreted *Herrera* to stand for the proposition that a petitioner is not entitled to postconviction relief without a showing of a violation of rights that were constitutional in dimension, which occurred at the time that the petitioner was tried and convicted. *State v. Campbell*, 1st Dist. Hamilton No. C-950746, 1997 Ohio App. LEXIS 11 (Jan. 8, 1997); *State v. Bound*, 5th Dist. Guernsey No. 04 CA 8, 2004-Ohio-7097; *State v. Watson*, 126 Ohio App.3d 316, 323, 710 N.E.2d 340 (12th Dist.1998); *State v. Loza*, 12th Dist. Butler No. CA96-10-214, 1997 Ohio App. LEXIS 4574 (Oct. 13, 1997). In *Watson, supra*, the court reasoned: "[S]ince the United States Supreme Court has not recognized actual innocence as a constitutional right, we also refuse to judicially create such a constitutional right." *Watson* at 323.
>
> {¶24} In light of the United States Supreme Court's decision in *Herrera*, we find no merit to appellant's due process arguments regarding his claims of actual innocence. Appellant argues that the interpretation of *Herrera* articulated above is incomplete in light of Congress's enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and the changes that statute brought to federal habeas procedures. However, the United States Supreme Court has examined constitutional arguments involving actual innocence claims post-AEDPA and has

refused to adopt appellant's position. *See McQuiggin v. Perkins*, 133 S.Ct. 1924, 1931, 185 L.Ed.2d 1019 (2013) (noting the fact that the Supreme Court "[has] not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence"). Moreover, we reject appellant's assertion that his actual innocence claims should proceed because they are "intertwined" with his argument that the state committed *Brady* violations. Indeed, appellant's *Brady* arguments were already decided by this court in his direct appeal and are, therefore, barred by res judicata.

{¶25} Accordingly, appellant's second assignment of error is not well-taken.

ECF Dkt. #7-1 at 625-27.

As stated earlier, states have no constitutional obligation to provide post-conviction remedies and habeas corpus cannot be used to challenge a state's post-conviction relief scheme. *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) (citing *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir.1986); *Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)). "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and ... the traditional function of the writ is to secure release from illegal custody." *Kirby*, 794 F.2d at 246 (quoting *Preiser v. Rodriquez*, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)); 28 U.S.C. § 2254(a). A challenge to procedure relied upon during collateral proceedings is not a challenge on the underlying conviction, and therefore, is not cognizable on habeas review. *Henry v. Trim*, No. 1:11CV301, 2014 WL 763234, at *37 (N.D. Ohio Feb. 21, 2014) (citing Kirby, 794 F.2d 245). Petitioner's Ground Five itself is not an actual innocence claim, but rather is a challenge to the trial court's treatment of his actual innocence claim. *See* ECF Dkt. #1; #1-2 at 6. Therefore, Ground Five is not cognizable.

Even if the Court were to liberally consider Ground Five as an actual innocence claim, it would have a narrow effect on federal habeas corpus review. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief

absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 860, 122 L. Ed. 2d 203 (1993).

A persuasive claim of actual innocence can be used to overcome procedural barriers on habeas corpus review so that a habeas court can reach the merits of an underlying constitutional claim. *See Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649, 91 L. Ed. 2d 397 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default"); *Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007); *Schlup v. Delo*, 513 U.S. 298, 314-15, 115 S. Ct. 851, 861, 130 L. Ed. 2d 808 (1995); *Zuern v. Tate*, 336 F.3d 478, 482 n.1 (6th Cir.2003) ("The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief but, rather, that the newly discovered evidence can only be reviewed as it relates to an 'independent constitutional violation occurring in the underlying state criminal proceeding'"). However, Respondent does not argue, nor does the undersigned find, that Petitioner procedurally defaulted this claim.

Petitioner ties his actual innocence claim to his Sixth Amendment IAC claim and Due Process claim under the Fourteenth Amendment. ECF Dkt. #10 at 55. However, as recommended earlier in this Report and Recommendation, the undersigned has not found merit to any of Petitioner's other grounds of relief. Contrary to Petitioner's assertion, Petitioner could have raised a claim on direct appeal in support of his claim of actual innocence, and, in fact, he did so. As the appellate court explained on collateral appeal, actual innocence claims have been characterized as manifest weight of the evidence claims—a claim that he raised on direct appeal and which was rejected. ECF Dkt. #7-1 at 203, 235-36. In addition, many of his other assignments of error on direct appeal were also arguably embedded with his underlying claim of actual innocence. *See*

ECF Dkt. #7-1 at 202-40. Overall, the undersigned recommends that the Court find that Petitioner's fifth ground for relief lacks cognizability in federal habeas review and dismiss it accordingly.

## VI.    CONCLUSION AND RECOMMENDATION

For the above reasons, the undersigned RECOMMENDS that the Court DISMISS Petitioner's §2254 federal habeas corpus petition (ECF Dkt. #1) in its entirety WITH PREJUDICE.


DATE: April 30, 2020                    /s/ *George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE


**ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).**